IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| PAUL D. TURNER, and Demetrio Hernandez, individuals | ) ) ) | |
| Plaintiffs | ) ) | No. 05 C 4595 |
| v. | ) ) | Judge Shadur |
| THE SALOON, LTD., Cheryl Gilberg, William Bronner and Mark Braver, | ) ) ) | |
| Defendants. | ) | |

**DEFENDANT SALOON'S MEMORANDUM OF LAW
IN SUPPORT OF SUMMARY JUDGMENT**

Defendant, the Saloon Ltd. (the "Saloon"), submits this Memorandum of Law in support of its Motion for Summary judgment on all the claims of Plaintiff Paul Turner, and states:

Turner was employed from 1999 to December 2004 by the Saloon as a waiter in its restaurant. Turner levels discrete claims against the Saloon under the ADA, Title VII, and Illinois and federal wage laws.[1] Turner's ADA claims are premised on his skin condition, psoriasis, which he claims to be a disability as defined by the ADA, and his practice of not wearing underwear which because of his psoriasis causes him discomfort. Turner contends the Saloon violated the ADA by: (i) discriminating against him when it directed employees to use a washroom if they had to expose their genitals when changing into work clothes; (ii) refusing his request to install a curtain in an employee area for him to change his clothes behind; and (iii) retaliating against him for asserting his ADA rights when it suspended him for violating the directive, by reducing his hours of work and discharging him two months later.

Turner's Title VII claims seek recovery for sex discrimination and retaliation. Generally, Turner avers that following his nine month sexual affair with his supervisor Dixie Lake, she

---

[1] The Second Amended Complaint contains seven counts: (I) discrimination and (II) retaliation under the Americans with Disability Act ("ADA") *42 U.S.C. § 12101 et seq.*; (III) sexual harassment and (IV) retaliation under the Civil Rights Act of 1964, *42 U.S.C. § § 2000e to 2000e-17*; (VI – VII) [sic] violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §203; and (VIII) [sic] the Illinois Wage Payment and Collection Act ("ILWPC"), 820 ILCS 105/4 (the together the FLSA and ILWPC shall be referred to as the "Wage Claims")

1

sexually harassed him by subjecting him to a hostile work environment; that the Saloon failed to take action on his complaints of harassment; and retaliated against him by disciplining him unfairly, adversely altering his work conditions, prohibiting nudity in the workplace and by terminating him from employment.

Finally, Turner's Wage Claims are that the Saloon willfully failed to pay him for all the hours he worked on Sundays. Specifically, on the Sundays Turner worked with Lake, she directed him to clock in late or out early or manipulated his hours to avoid him having overtime.

**Background Facts**

The Saloon operates a premium steakhouse restaurant at 200 East Chestnut Street in Chicago, a location it shares with the Seneca Hotel (the "Restaurant").[2] (Facts 2). Turner was employed as a waiter at the Restaurant from October 1999 to December 15, 2004. (Facts 7). As a waiter, Turner's main but not exclusive duty was to provide food and beverage service to the Restaurant's customers. Commensurate with the status of the Restaurant, the Saloon's waiters wear black pants, white shirts, a necktie and black jackets when on duty. (Facts 32) Turner was paid on an hourly basis plus tips. (Facts 66)

The Restaurant has three levels of management. Bill Bronner ("Bronner") was the highest management authority of the Saloon and carried the title of Owner's Representative. (Facts 4). Although Bronner did not have an office at the Restaurant, he regularly visited the Restaurant and was active in its management. (Facts 4). Reporting to Bronner was the General Manager, Mark Braver, who was responsible for the day-to-day management and operation of the Restaurant having onsite authority over all levels of the Restaurant's operations. (Facts 5). Reporting to Braver were several assistant managers including Lake, Bret Dresnick and the Chef. ("Supervisor" or "Supervisors") (Facts 5).

By all accounts Turner was a talented waiter. Turner generally produced the highest revenue of all the waiters, had an engaging personality which customers enjoyed, his knowledge of food and wine was often relied on by customers in making their selections and he could handle a large workload with proficiency. Turner's talent as a waiter however was marred by an endemic disregard of the Restaurant's rules, policies and directives, and an overall disrespect of management authority. Significantly, throughout his tenure such conduct earned him countless

---

[2] Unless noted otherwise or material to the subject, references to time and periods of time are omitted and generally reflect facts, events and circumstances that were consistent throughout Turner's employment.

disciplinary actions from virtually every manager that worked at the Saloon. As chronicled by the Saloon's 2001 to 2004 business records, Turner had an unparalleled record of disciplinary actions as shown by: (i) 15 written Disciplinary Action Notices issued to him by 4 different Supervisors; (ii) having received countless verbal warnings and adverse daily log entries by 8 different Supervisors, and (iii) having been suspended or sent home 7 times. (Facts 10-25, 62)

Turner's duplicative and varying incidents of misconduct illustrate the level of his contempt for the Restaurant's management and rules, and include scores of profanity laced instances of insubordination; fighting and arguing with other employees in front of customers; bullying other employees; ignoring customers; growling at his manager; chronic unsanitary practices; laying on a dining table in front of customers and putting ear drops in his ears; exposing himself; leaving the premises during his shift; watching television on the job; and being late for work. In many of these cases Turner was given notice that continued disruptive and insubordinate behavior could result in his termination of employment (Facts 10-25, 62).

On December 15, 2004, Turner's talents as a waiter were not enough to forestall the termination of his employment at the Saloon. On this day, Turner left the Restaurant during his shift without permission to run a personal errand leaving no waiters in the Restaurant. (Facts 61-62). At the time there were three Supervisors in the restaurant, Braver, Dresnick and Cory Shoemaker ("Shoemaker"); none of whom Turner notified that he was leaving (Facts 61). Turner was well aware of the Saloon's policy which required notice and permission of a Supervisor to leave the Restaurant during work time and he had been issued disciplinary warnings and received a suspension on prior occasions for the same conduct (Facts 16, 18-19, 62). While Turner was out, Braver and Dresnick had to be summoned from the basement office by the Chef to attend to customers who had entered the Restaurant during Turner's unauthorized absence. (Facts 61).

**Facts Relating to the ADA Claim**

Located in the Restaurant's basement are the Saloon's business office, employee washrooms, storage areas and employee locker area (the "Locker Area"). (Facts 33). The Locker Area is situated in an open and common area of the basement and is the place where employees store personal items or change into or out of their work clothes. (Facts 33). In October 2004, a

3

female employee complained to Braver that she had witnessed Turner naked while changing his clothes in the Locker Area, which Turner shortly thereafter confirmed to be true.[3] (Facts 34).

To avoid any further such incidents, Braver informed all employees in a series of pre-shift meetings that being naked in any area of the premises, including the Locker Area, was prohibited and employees should change in the washrooms if they needed to fully undress (Facts 35). Following Braver's announcement, Turner told Braver he did not want to change his clothes in the restroom because it was too dirty and asked if a curtain could be installed around the Locker Area for him to undress. (Facts 36).

Braver brought Turner's concerns to Bronner, and following consideration, determined that a curtain would not assure privacy, and Bronner and Braver advised Turner of their decision in a personal meeting with him. (Facts 37). Although the washroom was cleaned daily and regularly used by employees, in consideration of Turner's objection to using the washroom, Bronner secured permission from the Seneca Hotel to allow Turner to use its washroom restroom as an alternative location for him to change his clothes. (Facts 37). Turner was also advised that he could simply wear his black pants to work as did other employees. (Facts 37).

Shortly after being provided with these alternatives, Turner asked Braver if he could change into his clothes in a storage area of the basement referred to as the "Chemical Room". (Facts 39). This area has no door and is fully visible to anyone passing through the basement (Facts 39). Braver refused this request and on the next day, Braver witnessed Turner with his genitals exposed in the Chemical Room. (Facts ¶ 40). Braver issued a written disciplinary action notice to Turner for insubordination and suspended him for one week. (Facts 40). On October 20, 2004, Turner filed a Charge with the Illinois Department of Human Rights (Facts ¶ 40).

**Facts Relating to Title VII Claims**

Turner and Lake had been engaged in a sexual relationship from October 2001 to about October 2002, which they kept secret. (Facts 44). Turner contends that Lake started harassing him following the end of the relationship by making inappropriate comments and touching him, and that she retaliated against him for bringing his claims to managment by disciplining him

---

[3] Turner psoriasis intermittently causes plaques and rashes to form on his skin and the areas of his body most commonly affected by the psoriasis are around his scrotum and groin. (Facts 26). Excess or accumulated perspiration in these areas makes Turner uncomfortable. (Facts 28). Because underwear adds an additional layer of cloth around the afflicted area, thus causing him to perspire more, Turner does not wear underwear (Facts 28).

more harshly than others, diminishing his hours of work and by providing him with less favorable job assignments. (Facts 45, 46, 58). Turner states the harassment and retaliation continued throughout rest of his employment, however from the beginning he knew that Lake's conduct was unlawful. (Facts 45, 47).

In July 2003 Turner told Braver that Lake had been harassing him and Braver advised him that he would cause an investigation of the allegations; however Turner pleaded with Braver not to conduct an investigation or tell anyone of his allegations. (Facts 49-50). Braver reluctantly agreed to keep his allegations confidential and told Turner that he could come to him at anytime to have his charges investigated. (Facts 50). Following this meeting Braver investigated Turner's claims of retaliation, but found no evidence to substantiate Turner's claims. (Facts 51).

In March 2004 Turner told Braver he wanted an investigation of his charges of harassment by Lake. (Facts 52). Braver immediately informed Bronner of the charges and Bronner and Braver formally investigated Turner's allegations, which included reviewing Turner's employment record to verify his allegations of retaliation, and by conducting interviews with Turner, Lake, Dresnick, Shoemaker and other employees. (Facts 53-54). Bronner's investigation was inconclusive, however he warned Lake that such conduct was not tolerated and unlawful; instructed her that she was not to retaliate against Turner for bringing his complaint; and that she should limit her contact with Turner accordingly. (Facts 53-54). Bronner also instructed Turner to report any further instances of harassment to him. (Facts 54). Following March 2004, Bronner had inquired of Turner and Lake whether there were any problems and he received no report of any potential incidents of harassment. (Facts 55).

**Facts Relating to Wage Claims**

The entire basis of Turner's Wage Claims are that (1) during the period mid 2003 to the date he was terminated Lake worked and supervised him on virtually every Sunday he worked; (2) on each of these Sundays Lake specifically instructed him to alter his clock entries to avoid paying for hours worked or otherwise had done it herself; (3) he exceed 40 hours during each week he worked on a Sunday and was not paid for his time; and (3) Lake's stated reason for altering his time entries was to avoid him going over 40 hours for the week so as to avoid paying him wages at the overtime rate required by the Wage Laws. (Facts 67). No supervisor other than Lake ever instructed Turner to clock in late and out early, or modified his time clock entries (Facts ¶ 68).

5

**Summary Judgment**

Summary judgment is proper when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Jordan v. Summers, 205 F.3d 337* (7th Cir. 2000), *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). Turner must present "specific facts showing that there is a genuine issue for trial," Fed. R. Civ. P. 56(e), and "only if a reasonable jury could render a verdict" for Turner does he defeat summary judgment. *Vanasco v. National-Louis Univ.*, 137 F.3d 962, 965 (7th Cir. 1998). See also *Griffin v. City of Milwaukee*, 74 F.3d 824, 827 (7th Cir. 1996). Summary judgment is appropriately entered "'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Buckley Dement, Inc. v. Travelers Plan Adm'rs of Illinois,* 39 F.3d 784, 787 (7th Cir. 1994) (quoting *Celotex,* 477 U.S. at 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)).

**Argument: Violation of the ADA - Discrimination**

To establish disability discrimination Turner must show that he is disabled within the meaning of the ADA, in that he is qualified to perform the essential functions of the job, either with or without a reasonable accommodation, and that he suffered from an adverse employment action because of his disability. *Dvorak v. Mostardi Platt Associates, Inc*., 289 F.3d 479, 483 (7th Cir. 2002). At the outset, Turner fails to satisfy the threshold burden of showing that he has a disability.[4] Specifically, Turner cannot point to a single major life activity which was impaired or substantially limited by his psoriasis (Facts 29-31).[5] Indeed, Turner's condition did not prevent or severely restrict him from performing such major daily functions (Facts 7, 29-31). Of particular note, Turner's psoriasis did not restrict him from other vigorous activates such as participating in sports, including baseball in a highly competitive league during the hot summer months of 2003 and 2004. (Facts 31, 44). Turner was also able to perform the physical demands of his full time position as a waiter without limitation and accommodation, while at the same time bearing the rigors of working as active stage performer and screen actor (Facts 29, 30).

---

[4] An individual is disabled if he has (1) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (2) a record of such an impairment; or (3) being regarded as having such an impairment. *See* 42 U.S.C. § 12102(2); *Hoffman v. Caterpillar, Inc.,* 256 F. 3d 568, 571-72 (7th Cir. 2001).

[5] A major life activity is an activity of "central importance to daily life." *Toyota Motor Mfg., Ky., Inc v. Williams, 534 U.S. 184, 197, 151 L. Ed. 2d 615, 122 S. Ct. 681 (2002).*

Although the Saloon was aware of Turner's condition, it did not regard him as disabled. (Facts 27). Under a "regarded as" disabled theory Turner must show either: (1) the Saloon mistakenly believed him to have a physical impairment that substantially limits a major life activity; or (2) it mistakenly believed that an actual, nonlimiting impairment substantially limits a major life activity. See *Nese v. Julian Nordic Constr. Co.*, 405 F.3d 638, 641 (7th Cir.2005). Turner cannot point to any evidence to show the Saloon regarded him as disabled. Turner may contend that his request for to install a curtain triggered a belief that his practice of not wearing underwear substantially limited him in a major life activity; however there is no evidence to support this contention, especially in light of his hours, duties and working conditions did not change following his request. (Facts ¶¶ 42-43)

Even if Turner was able to meet the threshold burden of showing he is disabled within the meaning of the ADA, which he does not, he fails to show that the Saloon took an adverse employment action against him because of his disability. To meet this element, Turner may employ either the direct or indirect method. See *Timmons v. General Motors Corp.*, 469 F.3d 1122, 1127 (7th Cir. 2006). Under the direct method Turner may show either direct or circumstantial evidence that points to a conclusion that the Saloon acted as it did for illegal reasons, i.e. an outright admission of discrimination or by presenting sufficient circumstantial evidence pointing directly to a discriminatory reason for his termination. *Id.* at 1126. Under the indirect method Turner must first make out a prima facie case of discrimination by showing he was disabled, performing satisfactorily, subjected to adverse employment action, and treated less favorably than a nondisabled, similarly situated person. *Id*. If Turner shows all of these elements, the Saloon has the burden of showing a legitimate, nondiscriminatory reason for taking adverse action against him. *Id*. at 1128. If the Saloon meets its burden, Turner must show the Saloon's stated reason is pretextual. *Id.* Turner offers no evidence under the direct method and fails on three of the four elements of the prima facie case required by the indirect method.

To start, Turner offers no evidence that he was performing satisfactory. On the other hand the record provides a body of undisputable evidence to the contrary. (Facts 10-25, 62). To show an adverse employment action, Turner asserts that Braver's motive in directing employees not to openly expose themselves was to discriminate against him because of his disability. (Facts 35). Braver's directive however did not rise to the level of an adverse employment action as the directive applied to all employees; the directive did not change or alter working conditions in

that employees could still change in the washroom; and there is no evidence that Braver knew of Turner's purported disability at the time he gave the directive. See *Rhodes v. Ill. DOT*, 359 F.3d 498 (7th Cir. 2004) (inconveniences and do not rise to the level of an adverse employment action); *Adkins v. Briggs & Stratton Corp*., 159 F.3d 306, 307 (7th Cir. 1998) (employer not liable under the ADA for discharge of employee when it had no knowledge of the disability). Again giving Turner the benefit of the doubt on his *prima facie* case, the Saloon had sufficient business justification to prohibit nudity in the workplace. Indeed, Braver's directive came swiftly on a complaint of a female employee reasonably objecting to the practice. (Facts 35)

Turner also failed to present any evidence of a discriminatory animus that his suspension from Braver for insubordination i.e. disregarding the directive against workplace nudity was the product of a discriminatory motive. On the contrary, the disciplinary action was justified given Turner's utter indifference to a specific directive of senior management. (Facts 39-40). Proceeding to Turner's next contention of an adverse action, Turner claims that following his return to duty from suspension he was disciplined more harshly than others; his hours of work were reduced; was given less favorable table assignments which diminished his income; and that he was terminated all because of his disability. Turner offers no evidence, except insufficient conjecture, from which an inference of discrimination can be drawn. See *Traylor v. Brown,* 295 F.3d 783, 789 (7th Cir. 2002). On the other hand the record provides a body of undisputable evidence to show the contrary (Facts ¶ ¶ 42-43, 61-63).

**Argument: Failure to Accommodate**

Even if Turner could establish that he is a qualified individual with a disability, to protect his claim for failure to accommodate Turner must show that the Saloon was aware of his disability and it failed to accommodate the disability. See *EEOC v. Sears, Roebuck & Co., 417* F.3d 789, 797 (7th Cir. 2005) Turner's supervisors were aware he had psoriasis prior to the October 2004 directive; however there is no evidence to suggest that at this time the Saloon believed that Turner's psoriasis was a disability that restricted a major life activity or required an accommodation. Taking it a step further and assuming the Saloon was aware Turner had a disability requiring accommodation, the Saloon engaged in an interactive process and offered him reasonable and sufficient alternatives to using the washroom. (Facts 36-38); See *Baert v. Euclid Beverage, Ltd.,* 149 F.3d 626, 633 (7th Cir. 1998). Specifically, Braver and Bronner considered Turner's request; denied his request based on legitimate factors; met with Turner; and

8

to offered sufficient and reasonable alternatives, which Turner simply refused. (Facts ¶ 37-38). Under the ADA employees are entitled only to reasonable accommodations of their disabilities, and not to their preferred accommodations. *Mays v. Principi*, 301 F.3d 866, (7th Cir. 2002) See also*: Hoffman v. Caterpillar, Inc*., 256 F.3d 568 (Disabled employee does not have right to chose type of accommodation, and if reasonable accommodation is provided, court will not disturb employer's chosen method of accommodation). Moreover, although wearing pants was an essential function of Turner's job there was no restriction for him to work without underwear. (Facts 38). Turner could simply wear his pants to work as did other employees. (Facts 38). Finally, according to Turner, the policy only affected him; however others had been naked in the Locker Room and female employees would changed in the women's washroom. (Facts 33, 35).

**Argument: Retaliation**

Turner claims that the Saloon retaliated against him for asserting his rights under the ADA when it suspended him in October 2004 for violating Braver's directive, by diminishing his hours of work, changing his assignments and by ultimately discharging him in December 2004. A plaintiff claiming unlawful retaliation can proceed under either a direct or an indirect method of proof when faced with the employer's motion for summary judgment. Under the direct method, Turner must put forth direct or circumstantial evidence that he engaged in a statutorily protected activity, that the defendants subjected him to an adverse employment action and that a causal connection exists between the two events. *Treadwell v. Office of Ill. Sec'y of State*, 455 F.3d 778, 781 (7th Cir. 2006). Turner has no direct or circumstantial evidence to show a causal connection between the filing of his Charge and his discharge[6]. The sole vestige of a causal connection he may argue is the proximity of time between the filing of his Charge and his termination; however timing alone is sufficient circumstantial evidence to reach the level of having direct evidence. See *Burks v. Wis. DOT,* 464 F.3d 744, 758-59 (7th Cir. 2000). "Speculation based on suspicious timing alone . . . does not support a reasonable inference of retaliation." *Sauzek v. Exxon Coal USA, Inc*., 202 F.3d 913, 918 (7th Cir. 2000) (quoted in *Burks*, 464 F.3d at 758). Further "'[t]he mere fact that one event preceded another does nothing to prove that the first event caused the second'; the plaintiff also must put forth other evidence that reasonably suggests that her protected . . . activities were related to her employer's

---

[6] Turner's claim that his hours of work and table assignments were adversely affected following his Charge is unsupported and contrary to irrefutable evidence to the contrary. (Facts ¶¶ 42-43)

discrimination. . . ." *Burks*, 464 F.3d at 758-59, quoting *Sauzek*, 202 F.3d at 918. The record in this case provides overwhelming justification for Turner's discharge. (Facts 61-62).

Turner likewise fails to show he was retaliated against under the indirect method. To do so Turner must first establish a *prima facie* case by demonstrating that after engaging in protected activity, he was subjected to an adverse employment action even though he was performing his job satisfactorily, and no similarly situated employee who did not file a charge was subjected to the adverse employment action. *Burks* at 759. If Turner can meet this burden then the burden shifting analysis described above in *Timmons* comes into play. *Timmons*, 469 1127-1129. Turner fails to establish a *prima facie* case under the indirect method. First, Turner cannot show that he was satisfactorily meeting the Saloon's expectations (Facts ¶¶ 10-25, 62) Second, Turner fails to identify any similarly situated employee who did not file a Charge and was not suspended or discharged. To show that another employee is similarly situated, a plaintiff must show that there is someone who is comparable to him in all material respects. *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002). Employees who lack similar disciplinary history are not similarly situated because the employer's treatment of them can distinguished because of that history. Even if Turner met his burden under the indirect method, the Saloon had a legitimate non discriminatory reason to terminate his employment. (Facts 10-25, 62). Indeed, aside from having an extensive history of disciplinary actions against him, including two incidents for the very same reason he was terminated, leaving the Restaurant without proper notice and permission was simply irresponsible and jeopardized the Restaurant's standing with its customers. (Facts 10-25, 62)

**Argument: Sexual Harassment**

If the Court enters summary judgment on his ADA claims, Turner pleads alternatively to recover under Title VII for sexual discrimination and retaliation[7]. (SAC ¶ 27, Exhibit A). The vast majority of Turner's sexual harassment, however claims arose beyond the limitations period. In Illinois, an individual must file a Charge within three hundred days of the alleged harassment and the failure to do so bars litigation over those claims. 42 U.S.C. § 2000e-5(e) (prescribing limitation period for discrimination charges) See *Lucas v. CTA,* 367 F.3d 714, 720-721 (7th Cir. 2004). Here, Turner filed his Charge of Discrimination charging sexual harassment on March

---

[7] The SAC does not clearly identify whether the action is based on sex discrimination or harassment, however discovery reveled that Turner's claim is appropriately within the subset of harassment.

17, 2005; thus conduct alleged to have occurred prior to May 21, 2004 is generally not actionable,[8] unless the limitation period is subject to "equitable modification". (SAC ¶ 9; Ans. to SAC ¶ 9) See *Galloway v. General Motors Serv. Parts Operations*, 78 F.3d 1164, 1166 (7th Cir. 1996). Equitable tolling applies when a plaintiff, despite the exercise of due diligence and through no fault of his own, cannot determine information essential to bringing a complaint." *Soignier v. Am. Bd. of Plastic Surgery,* 92 F.3d 547, 553-54 (7th Cir. 1996) (citing *Thelen v. Marc's Big Boy Corp.,* 64 F.3d 264, 268 (7th Cir. 1995)). Equitable estoppel, however, applies where the defendant took active steps to prevent the plaintiff from suing in time. *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 450-51 (7th Cir. 1990); see *Mull v. ARCO Durethene Plastics, Inc.*, 784 F.2d 284, 292 (7th Cir. 1986) ("Equitable estoppel is available only if the employee's otherwise untimely filing was the result either of a deliberate design by the employer or of actions that the employer should unmistakably have understood would cause the employee to delay filing his charge." (citation and quotation omitted)). Even if a plaintiff has demonstrated that an employer took affirmative steps to lull them into inaction concerning the filing of a discrimination charge, the plaintiff must also establish "actual and reasonable reliance on the defendant's conduct or representations." *Mull*, 784 F.2d at 292 (quoting *Naton v. Bank of California*, 649 F.2d 691, 696 (9th Cir. 1981)); *see Hentosh v. Herman M. Finch Univ. of Health Sciences/Chicago Med. Sch.*, 167 F.3d 1170, 1174 (7th Cir. 1999); *Wheeldon v. Monon Corp.*, 946 F.2d 533, 537 (7th Cir. 1991).

Here, there is nothing to support an equitable modification of the limitation period. Turner admits that as early as 2002 he knew that the conduct he complains of in this claim was inappropriate and unlawful (Facts ¶ 47).[9] Moreover the record does not support a deliberate design by the Saloon or of actions that the Saloon should unmistakably have understood would cause Turner to delay filing his charge. Accordingly, the sole incident of Lake engaging in inappropriate conduct following May 21, 2004 was in August 2004 when Lake walked up on him when he was naked in the Locker Area and told him she missed seeing him like that. (Facts

---

[8] Applicable to the limitations period, Turner identifies only two actionable acts to support his claim. The first occurred in August 2004 when he purports that Lake had witnessed him naked in the Locker Area and commented to him that she "missed seeing [him] like this" and when Braver terminated him in December 2004 (Facts 46)

[9] Further demonstrating Turner's awareness of his rights, Turner filed two (2) charges of discrimination against the Saloon relative to his ADA claims (October 2004 and January 2005) and in neither Charge did he mention any claim against the Saloon for sex discrimination.

11

¶ 46). Notably, this was the sole incident to have occurred following the Saloon's investigation and directives regarding his charges of harassment. (Facts ¶ 46). In light of the circumstances of the comment and that in the context of being the sole incident to have occurred after the March 2004 investigation, it is insufficient to support Turner's claims. *See Hilt-Dyson v. City of Chi.*, 282 F.3d 456, 463-64 (7th Cir. 2002) (holding that plaintiff's allegations that a supervisor rubbed her back, squeezed her shoulder and stared at her chest during a uniform inspection while telling her to raise her arms and open her blazer were isolated incidents that, even when taken together, did not create a sufficient inference of a hostile work environment).

Even assuming that Turner's sexual harassment claim was subject to equitable modification and that he can point to sufficient evidence to show that he was subjected to a hostile work environment, there is no basis for employer liability.[10] *See Velez v. City of Chicago*, 442 F.3d 1043, 1047 (7th Cir. 2006). Where the actionable hostile environment was created by a supervisor with immediate (or successively higher) authority over the employee and no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence. (the "Ellerth Defense") *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998); *see also Faragher v. City of Boca Raton*, 524 U.S. 775 at 807-08, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998)[11]. The defense comprises two necessary elements: 1) the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and 2) the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. *Id.* No affirmative defense is available when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment. *Id.* The failure of an employer to have an anti-harassment policy with complaint procedure does not preclude an employer to assert the defense in every instance as a matter of law. *Id*

As a threshold matter, Lake did not impose nor did she engage in any conduct that culminated in a tangible adverse employment action against Turner and Turner has no evidence to show otherwise. A tangible employment action, which inflicts economic harm on the employee, can only be made by a supervisor, who "has been empowered by the company as a

---

[11] The defense is an affirmative defense which the Saloon asserted by denial of paragraphs 27, 29, and 33 of the SAC. ( Ans to SAC, ¶ ¶ 27,29,33, Exhibit B).

...
...

distinct class of agent to make economic decisions affecting other employees under his or her control." *Ellerth,* 524 U.S. at 762. Likewise, Lake had no part in Turner's October suspension or discharge whatsoever, and again Turner concedes he engaged in the conduct precipitating the action (Facts ¶ ¶ 62, 64).

During Turner's employment the Saloon did not have a written sexual harassment policy; however Turner was certain that the Lake's conduct was inappropriate, unlawful and that he could raise his complaint with management and that would act on his complaint (Facts 47-49). In fact, Turner was offered the opportunity to have his claims investigated in July 2003 he elected not to take advantage of any preventive or corrective opportunities afforded to him by Braver (Facts 50). When Turner complained to Bronner in March 2004, Bronner immediately investigated the allegations, and although Turner's allegations could not be substantiated, Bronner did counseled Lake and Turner on the subject, directed Lake against engaging in such conduct, told Turner to report any further inappropriate conduct, and monitored the situation thereafter. (Facts 52 53). Significantly, Turner refused to memorialize his complaint against Lake despite being requested to do so by Bronner, destroyed his notes and logs that he had prepared, and following Bronner's investigation Turner never notified him of any further instances of harassment by Lake (Facts 48-55).

**Argument: Retaliation under Title VII**

The Saloon incorporates its legal authority relating to Turner's ADA retaliation claims, cited in this Memorandum. Turner's claim of retaliation for having complained to Braver and Bronner of Lake's harassment fails under the direct method as he is without the requisite evidence. See *Treadwell* at 781. Under the indirect method Turner also fails to meet his burden to show that he was satisfactorily meeting the Saloon's expectations (Facts 10-25, 62). Turner also fails to carry his burden to identify any similarly situated employee who did not file make a complaint to management and were not suspended or discharged. See *Patterson* at 680. Even if Turner met his burden under the indirect method, the Saloon had a legitimate non discriminatory reason to suspend him in October and terminate his employment in December. (Facts 24, 62). Specifically, following Turner's complaint to Bronner, the sole cognizant adverse actions taken against Turner were by Braver when he suspended Turner for violating his directive against nudity and discharging him in December 2004 for leaving the Restaurant during his shift without permission. (Facts 24, 62). Turner has no evidence to show that Braver's actions were motivated

to retaliate against him for asserting his rights and at the end of the day, for purposes of avoiding summary judgment, Turner is obligated to produce some evidence that its actions were motivated to retaliate against him for activity protected by Title VII.. *Nair, 464 F.3d at 769.*

**Argument: Wage and Hour Claims**

An employee who brings suit for unpaid overtime compensation has the burden of proving that he performed work for which he was not properly compensated. *Anderson v. Mount Clemens Pottery Co.*, 328 U.S. 680, 687, 66 S. Ct. 1187, 90 L. Ed. 1515 (1946). This generally requires a showing that the employer's time records are either "inaccurate or inadequate." *Bjornson v. Daido Metal U.S.A., Inc.*, 12 F.Supp.2d 837, 840 (N.D. Ill. 1998) (quoting *Mount Clemens*, 328 U.S. at 687). If the employee meets his burden, the burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negate the reasonableness of the inference to be drawn from the employee's evidence. *Id.* at 687-88.

Turner offers nothing to meet his burden to show he was not properly compensated or that the Saloon's records are inaccurate or inadequate. (Facts 68) In fact, the indisputable evidence shows Turner's claims to be unsupported, groundless and punitive. (Facts 69-73). First, from July 1, 2003 to December 15, 2004 Lake only worked on 4 of the 33 Sundays that Turner worked.[12] (Facts 70). Second, on the 29 Sundays Turner worked during this period, Turner worked with and was supervised by either Braver or Dresnick, neither of which ever instructed Turner to alter his time entries or otherwise did it themselves. (Facts 70). Third, on 2 of the 4 Sundays when Turner and Lake worked together, Turner had worked less than 30 hours in the preceding six days of the week and thus he was not within the orbit of 40 hours. (Facts 72). On the remaining two occasions, Turner went into the shift with 34.98 hours and 40 hours, respectively, and on both these occasions the Saloon's time and pay records indicate he worked the typical and historic number of hours for a Sunday shift and was paid the overtime rate for the hours he worked over 40. (Facts 72).

The proverbial bottom line is that there is no, nor has there ever been any evidence to support Turner's allegations. Indeed, since January 2005 Turner has had access to volumes of the Saloon's historical management logs and employee time records; the same as were relied on by

---

[12] The Saloon is unable to determine the FHM on duty on September 7, 2003

the Saloon to refute his claims, and nothing was found to support his allegations. When the records failed to turn up any evidence to support his claims, Turner amended his Complaint to allege a class application of his claims and caused a Class Notice to be sent by mail to the Saloon's former and current employees to provide another avenue to find evidence on his claims. With the exception of a single former employee, who worked about 3 months for the Saloon, Turner again came up empty.[13] Accordingly, Turner's Wage Claims should be dismissed.

For the reasons set forth herein, Defendant Saloon prays for entry of Summary Judgment in its favor and against Plaintiff Turner.

_____
s/ James V. Daffada

James V. Daffada
Karacic & Daffada
1150 Wilmette Ave
Wilmette, Il 60091
847-251-4091

Thomas Leinenweber
Leinenweber & Baroni, LLC
321 South Plymouth Ct 12th Floor
Chicago, Il 60604
312-663-3003

---

[13] Based on the aforesaid, it is reasonable to believe that Turner's persistence in prosecuting his Wage Claims is motivated by an improper purpose. Notably, Turner named shareholders, officers and managers of the Saloon as individual defendants in his Wage Claims, however he never attempted to serve process on any of these individual defendants and despite having the opportunity and benefit of volumes of discovery, including the mailing of notices to former and current employees, depositions and document productions, all of which show no basis to complain against the individual defendants or that his claims have no evidentiary support, has continued to prosecute his Wage Claims against the Saloon.