IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

PAUL TURNER,[1]            )
                          )
          Plaintiff,      )
                          )
     v.                   )    No.  05 C 4595
                          )
THE SALOON, LTD., et al., )
                          )
          Defendants.     )

<u>MEMORANDUM OPINION AND ORDER</u>

Paul Turner ("Turner") has brought a seven-count Complaint against his ex-employer The Saloon, Ltd. ("Saloon") and certain owners and members of management, alleging (1) that he was discriminated and retaliated against because of a skin condition in violation of the Americans with Disabilities Act ("ADA," 42 U.S.C. §§12101-12117) and (2) that he was harassed and discriminated against based on his sex in violation of Title VII of the Civil Rights Act of 1991 ("Title VII," 42 U.S.C. §§2000e to 2000e-17).  Turner further claims that Saloon violated the Fair Labor Standards Act ("FLSA," 29 U.S.C. §203) and the Illinois Wage Payment Act (those claims are collectively referred to here as "Wage Claims").

_____

[1]  On February 27, 2007 this Court granted the motion of counsel for co-plaintiff Demetrio Hernandez ("Hernandez," who had been added as a plaintiff on December 19, 2006 via the Second Amended Complaint) to withdraw from representing him for the reasons specified in counsel's motion and affidavit.  Since then nothing has been heard from Hernandez, nor according to counsel's affidavit is there any known way to reach him.  Under the circumstances, Hernandez' claims are dismissed with prejudice for want of prosecution.

Saloon has moved for summary judgment under Fed. R. Civ. P. ("Rule") 56 on all of Turner's claims, and Turner has in turn moved for a ruling as a matter of law to preclude Saloon from asserting affirmative defenses on the sexual harassment count. For the reasons stated in this memorandum opinion and order, Saloon's motion is granted as to all claims other than the Wage Claims, while Turner's motion is denied as moot. This Court anticipates dealing with the Wage Claims shortly.

<u>Summary Judgment Standard</u>

Well-established Rule 56 principles impose on parties wishing to prevail on summary judgment the burden of establishing a lack of a genuine issue of material fact (<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986)). For that purpose this Court must consider the evidentiary record in the light most favorable to Turner and draw all reasonable inferences in his favor (<u>Lesch v. Crown Cork & Seal Co.</u>, 282 F.3d 467, 471 (7th Cir. 2002)). But to avoid summary judgment, Turner must produce "more than a mere scintilla of evidence to support his position" that a genuine issue of material fact exists (<u>Pugh v. City of Attica</u>, 259 F.3d 619, 625 (7th Cir. 2001)) and "must set forth specific facts that demonstrate a genuine issue of triable fact" (<u>id</u>.). If the record were to reveal that no reasonable jury could find in favor of Turner, summary judgment will be granted (see <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)).

To evaluate that possibility, what follows is a summary of the facts, viewed of course in the light most favorable to Turner under the criteria prescribed by Rule 56 and this District Court's LR 56.1.[2] And that obviates the need, in the evidentiary recital, to repeat "according to Turner" or the like or to identify any conflicting account, though the latter is sometimes included for purely informational purposes.

## Background

From 1999 until his termination in December 2004, Turner worked as a waiter at Saloon, a Chicago restaurant specializing in steaks (T. St. ¶¶1-2). Turner consistently earned more money in tips than any other waiter, due in part to his skillful presentation of Saloon's steak cuts, which many patrons enjoyed so much they specifically asked for Turner to serve them (id. ¶3).

Saloon's managerial staff comprised several persons. William Bronner ("Bronner") is the Owners' Representative who created and

---

[2] LR 56.1 implements Rule 56 by requiring each party to submit evidentiary statements and responses to such statements to highlight which facts are disputed and which are agreed upon. This opinion cites to Saloon's statement as "S. St. ¶--," to Turner's response as "T. St. ¶--" and to his additional facts as "T. Add. St. ¶--." Where an assertion in either party's LR 56.1 statement is undisputed by the opponent, the opinion includes only a citation to the original statement. "T." and "S." designations are also used in referring to all other documents submitted by the parties. Finally, for simplicity's sake citations to the witnesses' depositions (cited "Dep.") will abbreviate their names: "T." for Turner, "B." for Braver, "Br." for Bronner and "L." for Lake.

developed operating procedures and reported directly to Saloon's owners (T. St. ¶9). Mark Braver ("Braver"), who reports to Bronner, has been the general manager of Saloon since April 2002 and has been directly responsible for all of Saloon's day-to-day business activities (S. St. ¶5). Supervisors who report to Braver include Denise "Dixie" Lake ("Lake") and Brett Dresnick ("Dresnick")(S. St. ¶5). Turner reported to Braver, Dresnick and Lake (T. St. ¶10; Br. Dep. 48).

In 1995 Turner was diagnosed with psoriasis, a skin condition that mostly affects his genital area, elbows and knees (T. Dep. 179-81). Due to his skin condition Turner cannot wear underwear because it causes him to sweat in his groin area, which in turn irritates the region affected by psoriasis (S. St. ¶28). Braver knew about Turner's skin condition and the fact that it made Turner uncomfortable (id. ¶29). Despite his psoriasis Turner could still ride in a car and ride a bike, and walking was "usually fine" as long as he avoided wearing too many layers of clothing (T. Dep. 186). Psoriasis did not preclude Turner from playing softball during the summers of 2003 and 2004 (id. 79), and his psoriasis does not currently impact Turner in his new job as a server at Morton's Steakhouse (id. 188).

Turner's habit of eschewing undergarments because of his psoriasis eventually became an issue at Saloon, because when he would change into his work clothes on the premises he exposed

himself to other members of the wait staff (S. St. ¶33).  When a
female server complained to Braver about encountering Turner
naked in the common employee area, Braver instituted a new
policy:  Employees were not to expose themselves in any of the
common areas, and if they were going to be naked they would have
to change clothes in the employee washrooms (id. ¶¶34-35).

After the new policy was instituted, Turner told Braver that
he did not want to change in the men's washroom because it was
too dirty (S. St. ¶36).  Turner proposed that Braver install a
curtain around a portion of the common area where he could
undress (id.).  Braver and Bronner discussed Turner's proposal
but determined that a curtain would not assure sufficient
privacy, so they told Turner that he could either wear his work
pants to the premises or change in the private washroom of the
adjacent Seneca Hotel (id. ¶¶37-38).  Turner rejected those
alternatives and asked if he could change in Saloon's storage
basement, but Braver rejected that alternative because there was
no door to the basement area and privacy could not be assured (S.
St. ¶39).

Following the discussion about the storage basement, Braver
found Turner standing in the basement with his genitals exposed,
so he issued a written warning to Turner and suspended him for
one week for violating Saloon policy (S. St. ¶40).  On October 4,
2004 Turner filed a Charge of Discrimination with the Illinois

Department of Human Rights (id. ¶41), alleging that Saloon
discriminated against him because of his psoriasis in violation
of the ADA.

Additionally, for nine months during 2002 Turner and Lake
engaged in a secret consensual sexual relationship that ended in
November of that year (T. St. ¶13). Based on interactions
between Lake and Turner after their affair ended, Turner claims
that Lake sexually harassed him on the job (id.). Turner
believes that he experienced increased rage from Lake, suffered
oral reprimands in the presence of the rest of the staff, was
assigned to less profitable tables and endured Lake's offensive
touching and comments (id. ¶14). According to Turner, Lake's
harassment continued from the end of their affair in 2002 until
his termination in 2004 (id. ¶15). Not surprisingly, Lake denies
that she treated Turner any differently from other members of the
wait staff and denies that she touched him or spoke to him
inappropriately (L. Dep. 47, 56-63).

Though Lake denies the matters set out in this paragraph (L.
Dep. 63), Turner says (and this opinion credits his version) that
Lake told him not to report any incidents between himself and
Lake to Saloon management because they would both lose their jobs
(T. St. ¶17). Those incidents persisted throughout 2003 and
2004, including on Father's Day 2003 when a customer spilled
champagne on Turner's pants and Lake followed him to the bar

area, put her hands in his pants and touched him inappropriately
(id. ¶19). On New Year's Eve 2003 Lake tried to kiss Turner, but
when he refused Lake told him he was "crazy" (id. ¶21). In
August 2004 Turner was in the employee area changing into his
uniform for his shift, and Lake watched him change and commented
that she "missed seeing [Turner]" without clothing (id. ¶23).
Throughout 2004 Turner was unfairly disciplined by Lake, while
also enduring her inappropriate touching and comments (id. ¶24).

Turner knew that Lake's conduct was unlawful as soon as it
started, as his deposition testimony demonstrates (T. Dep. 132):

> Q:  Did you know that it was-- inappropriate at the
>     time she started doing this?
>
> A:  Yes.

In July 2003 Turner brought his complaint to Braver, who in turn
offered to initiate a formal investigation and to let Bronner
know (T. St. ¶27). During that conversation Turner got the
impression that Braver thought it would be best to hold off
before taking the issue to Bronner, but Braver agreed that if the
situation got worse he would call a meeting with Bronner (T. Dep.
138). Turner was afraid to pursue his allegations because he was
afraid he would lose his job. (id. 138-39). Turner also said
that Braver "ma[d]e fun of" the allegations when Turner next
mentioned an incident to Braver (id. 148).

Braver recalled that Turner asked him not to launch a formal
investigation and said that "[u]nder normal circumstances, I

would have immediately begun a formal investigation. But because [Turner] begged me not to look into it--he just wanted it to stop without me talking to anyone" (B. Dep. 124-25). Based on Turner's request that Braver not investigate the allegations formally, Braver looked at the disciplinary actions that Turner had received from Lake and determined that he did not think she had disciplined him "any more harshly than any other managers for similar things for any other employees"(id. 125).

In the spring of 2004 Turner agreed that Bronner should be told about the situation between himself and Lake (T. Dep. 101). During a meeting with Bronner and Braver, Turner suggested that he would be more comfortable if someone other than Lake were his supervisor, but Bronner informed him that was impossible (Br. Dep. 80). Turner read from prepared notes during that meeting, but he later destroyed them (T. Dep. 152-53). Bronner testified that Turner complained of having to endure Lake's unfair treatment and unsolicited touching (Br. Dep. 64).

Bronner began to investigate Turner's allegations by speaking with Lake and other employees (Br. Dep. 54-55). Bronner met with Lake and told her that she was not to touch Turner physically and that sexual harassment was against the law and would not be tolerated (id. 144-45). In a later meeting among Bronner, Turner and Lake, Lake denied all the allegations, and Bronner told them both that he would continue to monitor the

situation and that he hoped they could work together (id. 66). At no time, however, did Bronner draw a conclusion about whether Lake sexually harassed Turner (id. 67). Neither Bronner nor Braver disciplined Lake in connection with Turner's allegations (L. Dep. 51), and she still works as a manager of Saloon today (id. 14). Indeed, Lake continued to supervise Turner until the day of his termination.

During Turner's tenure Saloon did not have a written sexual harassment policy, nor did it conduct any training for its managers on how to handle allegations of sexual harassment (T. St. ¶4). Lake was never instructed not to date the employees she supervised (id. ¶7). Turner filed a Charge of Discrimination for Sexual Harassment and Retaliation with the EEOC on January 18, 2005, three months after he filed his ADA discrimination charge.

During his tenure at Saloon Turner encountered other difficulties that ostensibly contributed to management's decision to terminate him. Beginning in 2000 Turner was disciplined orally for such conduct as arriving late to his shift, eating food off the production line, fighting with other employees in the presence of customers and watching television (S. St. ¶10). During that time he also received a written warning for using vulgar language and repeatedly eating food from the production line after being warned it would result in punishment (id. ¶11).

Saloon records reflect that in 2002 Turner received over

eight oral disciplinary warnings for various infractions, including shirking his closing duties, pushing a busboy during a fight or not clocking out at the end of his shift (id. ¶12). Written warnings in 2002 show that Turner was disciplined for being late to work (id. ¶13), for swearing at Braver and refusing to leave his office (id. ¶14) and for arguing with another employee, which resulted in a suspension (id. ¶15). On his written disciplinary reports, Turner was warned that his failure to take corrective action would result in further suspension or termination (id. ¶¶14-15).

As recorded by Saloon's supervisors (including Lake, Braver and Dresnick) and by Saloon chef Corey Shoemaker, Turner's performance did not improve significantly in 2003, when he was issued seven oral warnings for such things as ignoring customers, watching television at the bar instead of serving customers, confronting and yelling at a busboy and leaving the restaurant without notifying his supervisor (S. St. ¶16). Turner was likewise written up for insubordination, for smoking outside without permission during his shift, resulting in a three-day suspension, and for lying on a table to put eardrops in his ears while customers were dining in the restaurant (id. ¶¶17-20).

Turner's less-than-stellar disciplinary record was further tarnished in 2004 when he received seven oral warnings for conduct that was problematic in the previous years, such as

arguing with busboys, insubordination, being argumentative with the sous chef, leaving without completing his work and failure to show up for a shift (id. ¶21). Turner's written disciplinary reports that year reflect that he was suspended for a day for "horseplay on the floor during service," disregarding a Saloon rule not to be naked in common areas and polishing a wine glass with a linen napkin in violation of Saloon policy (id. ¶¶22-25). Despite all that, in February 2004 Turner received a performance evaluation from Braver that gave him a high score and noted that Turner is "[o]ne of the best employees. Much improved in the last year. Paul is a serious asset & draws a lot of business to the saloon" (T. Add. St. ¶3).

Matters came to a head on December 15, 2004, when Turner left the restaurant without permission during his shift so that he could run personal errands (S. St. ¶¶61-62). Because Turner left the floor and there were no other servers available to wait on customers, Braver terminated Turner as soon as he returned to Saloon for violating Saloon policy requiring permission to leave during a shift (id. ¶62). Braver's decision to terminate Turner was based on Turner's disciplinary record and on prior warnings that failure to correct his behavior would result in his termination (id.). After Turner filed a claim for sexual discrimination and retaliation, he received his right-to-sue letter on June 15, 2005 and commenced this suit on August 11,

2005.

ADA Claims

ADA makes it unlawful to discriminate "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees,...and other terms, conditions and privileges of employment" (42 U.S.C. §12112(b)(5)(a)). To that end plaintiffs may employ either the direct or indirect method of proof to demonstrate that they were discriminated against.[3] <u>Timmons v. General Motors Corp.</u>, 469 F.3d 1122, 1126 (7th Cir. 2006) explains that "[u]nder the so-called 'direct' method, the plaintiff may show either direct or circumstantial evidence that points to a conclusion that the employer acted as it did for illegal reasons." And <u>Kampmier v. Emeritus Corp.</u>, 472 F.2d 930, 937 (7th Cir. 2007) explains Turner's burden if he proceeds under the indirect method:

> To make a prima facie case of disability discrimination at the summary judgment phase, a plaintiff must offer evidence that: (1) [ ]he is disabled within the

---

[3] In the summary judgment context, of course, Turner's burden is only one of demonstrating the existence of genuine issues of material fact, not one of proof as such (see <u>Anderson v. Baxter Healthcare Corp.</u>, 13 F.3d 1120, 1124 (7th Cir. 1994)). But any continued repetition of that burden involves an awkward locution, an awkwardness contributed to by the fact that so much of the caselaw speaks of what a party responding to a Rule 56 motion must "establish" or "prove" or "show." Whenever this opinion employs such terms, it should therefore be understood as denoting only Turner's lesser burden described in this footnote, not the actual burden of persuasion.

12

> meaning of the ADA, (2) [ ]he was meeting [his]
> employer's legitimate employment expectations, (3)
> [ ]he was subject to an adverse employment action, and
> (4) similarly situated employees received more
> favorable treatment.[4]

If Turner can make out a prima facie case, "the burden shifts to the employer to articulate a legitimate nondiscriminatory reason for the adverse employment action" (Timmons, 469 F.3d at 1126). Once Saloon does so, Turner then has the burden "to show the employer's stated reason is simply pretext for discrimination" (id.).

Turner does not explicitly say which route he is pursuing to prove his claim, and he does neither effectively. Because he offers no direct or circumstantial evidence that he suffered an adverse employment action because of his psoriasis, this Court is left to assume that he is proceeding under the indirect method of proof. But as the ensuing analysis shows, Turner is unable to get to first base in those terms--he does not even establish a prima facie case.

First, Turner is entitled to protection under ADA only if he can prove that his psoriasis "substantially limits one or more major life activities" (42 U.S.C. §12102(2)(A)). For that purpose he asserts that his condition substantially limits his

---

[4] [Footnote by this Court]  Here and elsewhere throughout this opinion, several caselaw quotations have been adapted by changing from female to male gender references, so as to apply directly to Turner.

ability to walk.  But that contention is fatally undermined by his own testimony, which torpedoes any notion that he sustains meaningful limitations on his perambulation.  Turner admits that after "long periods of walking" the psoriasis becomes a problem "the more layers of clothing [he] wears," but as long as he does not wear undergarments he can "walk usually fine" (T. Dep. 186). Because Turner nowhere asserts that Saloon insisted that he wear undergarments, no reasonable jury could find that he was substantially limited in walking.  Thus having failed to show he is disabled in ADA terms, Turner cannot prevail on that claim.

But even if his psoriasis were to be viewed as a "disability" (as it is not), there is ample evidence that Turner's disciplinary problems rendered him unable to meet Saloon's legitimate expectations as to his job performance.  It is undisputed that on the day he was terminated he had left Saloon on personal business during his shift without permission from a member of management staff, leaving the restaurant without wait staff to serve the customers.

Suppose however that Turner could surmount the hurdle of meeting Saloon's expectations (as he has not).  Even on that unjustified assumption, Turner still fails because he cannot show that he suffered an adverse employment action.

In that respect Turner appears to suggest that Saloon's policy directing employees not to expose themselves was designed

to discriminate against him because he was unable to wear undergarments. As he would have it, the discipline he received for being naked in the common areas after the policy was instituted was discriminatory adverse action, on the theory that the new rule "unilaterally" affected him and "no one else at the Saloon" (T. Opp. Mem. at 15). Not so--the policy was directed at and applied to <u>all</u> employees.

Moreover, all employees were still allowed to change clothes in the washrooms, which (though arguably inconvenient) did not rise to the level of discrimination. <u>Rhodes v. Ill. Dep't of Transp.</u>, 359 F.3d 498, 505 (7th Cir. 2004) reminds us that "[n]ot everything that makes an employee unhappy qualifies as an adverse action for Title VII." It is worth observing that Saloon changed its policy to prohibit employee nudity in common areas after a female employee had complained about being exposed to a co-worker. If Saloon had not instituted the new policy, it might well have lost some of its employee talent or been subjected to other lawsuits.

Finally, Turner offers no examples of other employees who were similarly situated but treated more favorably. In sum, without providing so much as a scintilla of evidence, Turner cannot meet the burden of establishing a prima facie case of disability discrimination, and Saloon's motion is granted as to that claim.

This opinion turns, then, to Turner's claim that Saloon failed to accommodate his psoriasis. On that score an employer may be rendered liable "by not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability" (<u>Basith v. Cook County</u>, 241 F.3d 919, 927 (7th Cir. 2001)(internal quotation marks omitted)). Only brief discussion is needed to see that he fares just as poorly on that claim.

<u>EEOC v. Sears Roebuck & Co.</u>, 417 F.3d 789, 797 (7th Cir. 2005) teaches:

> To establish a claim for failure to accommodate, a plaintiff must show that (1) [ ]he is a qualified individual with a disability; (2) the employer was aware of the disability; and (3) the employer failed to reasonably accommodate the disability.

<u>Sears Roebuck</u>, <u>id</u>. (internal quotation marks omitted) further states that the third element "requires that employer and employee engage in an interactive process to determine a reasonable accommodation."

As above, Turner cannot show that he is a qualified individual with a disability--and that alone dooms that claim. Even beyond that, it is undisputed that Saloon and Turner engaged in the interactive process. When Braver announced the new rule and Turner was displeased, Turner asked for a curtain to be installed. Though Saloon management rejected that option due to its potential lack of privacy, Braver told Turner that Saloon had

entered into an agreement with the adjacent hotel that would
allow Saloon employees to change in their washrooms. And Turner
was also advised that he was free to arrive at work already
dressed in his uniform pants.

Mays v. Principi, 301 F.3d 866, 872 (7th Cir. 2002) clearly
prescribes the type of accommodation an employer must provide:
"an employer is not required to provide accommodation for a
disabled employee that is ideal from the employee's standpoint,
only one that is reasonable in terms of costs and benefits."
Here Saloon offered Turner several viable alternatives that
satisfied its obligation. So even if Turner had suffered an ADA-
recognized disability (as he has not), his reasonable
accommodation claim would have to be rejected on an independent
ground. Saloon's motion is granted in that regard as well.

<u>Sexual Harassment Claim</u>

As indicated earlier, Turner also claims that he was
sexually harassed by Lake in violation of Title VII (42 U.S.C.
§§2000e-2 and 2000e-3). But that claim must first overcome a
statute of limitations defense based on the 42 U.S.C. §2000e-
5(e)(1) requirement that a "charge of employment discrimination
must be filed with the EEOC within 300 days of the alleged
unlawful employment practice" (Roney v. Ill. Dep't of Transp.,
474 F.3d 455, 460 (7th Cir. 2007)). Roney, id. goes on to say
that "[i]f a plaintiff does not file a charge concerning a

17

discrete act of discriminatory conduct within 300 days of its occurrence, his claim is time-barred and he cannot recover."

With Turner having filed his EEOC charge on January 18, 2005, Saloon argues that any discrete act of harassment that occurred before May 21, 2004 should not be considered. Nat'l R.R. Passenger Corp. V. Morgan, 536 U.S. 101, 113 (2002) is emphatic on that point:

> Discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges. Each discriminatory act starts a new clock for filing charges alleging that act.

To counter that rule, Turner argues that Lake's conduct called into play the "continuing violation doctrine," which "allows a plaintiff to get relief for a time-barred act by linking it with an act that is within the limitations period" (Selan v. Kiley, 969 F.2d 560, 564 (7th Cir. 1992)). Selan, id. (internal quotation marks omitted) explains that plaintiffs have three possible routes under that theory, the only one of which potentially relevant here requires Turner to show that:

> the employer has, for a period of time, followed a practice of discrimination, but has done so covertly, rather than by way of an open notorious policy....In such cases the challenged practice is evidenced only by a series of discrete, allegedly discriminatory, acts.

To avail himself of that theory and compel the consideration of acts occurring before May 21, 2004, Turner must have "produced sufficient evidence to establish that there existed a genuine issue of fact whether [Lake's] acts were related closely enough

to constitute a continuing violation or were merely discrete, isolated, and completed acts which must be regarded as individual violations" (<u>Selan</u>, <u>id</u>. at 565 (internal quotation marks omitted)).

In that respect Turner testified about just one incident of sexual harassment that occurred after May 21, 2004, where Lake walked up to him while he was naked in the employee common area and made a sexually suggestive comment.  And it is uncontroverted that the earlier and potentially-time-barred incidents also involved Lake's sexually suggestive comments and physical advances.  That scenario must be viewed under the principle taught in <u>Selan</u>, <u>id</u>. (internal quotations and citations omitted), under which a discrete act will be treated as part of a series only where:

> it would have been unreasonable to require the plaintiff to sue separately on each one.  In a setting of alleged discrimination, ordinarily this will be because the plaintiff had no reason to believe he was a victim of discrimination until a series of adverse actions established a visible pattern of discriminatory treatment.

Just to state that principle is to deep-six Turner's claim, for he cannot reasonably contend that the earlier incidents did not trigger a belief that he was being harassed and should file a charge.  It will be recalled that he did complain to Braver about being sexually harassed back in July 2003, so that he then plainly knew that Lake's conduct was inappropriate and

actionable. Nor would it be reasonable to find that Turner did not believe he was being harassed throughout late 2002 and 2003, when Lake would do things such as putting her hands in Turner's pants after he spilled champagne on himself in June 2003. Indeed, Turner has actually admitted that he knew that Lake's conduct was inappropriate from the moment the harassment started (T. Dep. 132). Because Turner thus knew that Lake's conduct was unlawful as early as late 2002 when it first began, he cannot seek refuge in the continuing violation doctrine. That being so, any incidents occurring before May 21, 2004 are time-barred and are therefore not actionable.

As for the single act of harassment that occurred _within_ the 300-day period before Turner filed his EEOC charge, <u>Jackson v. County of Racine</u>, 474 F.3d 493, 499 (7th Cir. 2007) states the operative principle:

> One of the ways in which Title VII's prohibition against sex discrimination in the terms and conditions of employment may be violated is through sexual harassment that is either severe or pervasive enough to create an abusive working environment.

Under that theory Turner "must show, among other things, that [ ]he has been subjected to behavior so objectively offensive as to alter the conditions of [his] employment" (<u>Jackson</u>, <u>id</u>. (internal quotation marks omitted)). Or, as <u>Hall v. Bodine Elec. Co.</u>, 276 F.3d 345, 354-55 (7th Cir. 2002)(internal quotation marks omitted) has said of plaintiffs such as Turner:

In order to establish a prima facie case of hostile
environment sexual harassment, a plaintiff must
demonstrate that: (1) [he] was subjected to unwelcome
sexual harassment in the form of sexual advances,
requests for sexual favors or other verbal or physical
conduct of a sexual nature; (2) the harassment was
based on [the individual's] sex; (3) the sexual
harassment had the effect of unreasonably interfering
with the plaintiff's work performance in creating an
intimidating, hostile or offensive working environment
that affected seriously the psychological well-being of
the plaintiff; and (4) there is a basis for employer
liability.

Jackson, 474 F.3d at 499 (internal quotation marks omitted) has

further described how to evaluate Turner's claim:

In order to decide whether a plaintiff's showing at the
summary judgment stage meets this standard, the court
must examine all the circumstances, including the
frequency of the discriminatory conduct; its severity;
whether it is physically threatening or humiliating, or
a mere offensive utterance; and whether it unreasonably
interferes with an employee's work performance.

Thus Turner must offer sufficient proof to enable a

reasonable jury to find that the one incident in May, when he was

changing into his uniform and Lake made a suggestive comment, was

severe or pervasive. But that comment does not on its face

appear particularly threatening or humiliating, nor does it seem

inflammatory enough to interfere unreasonably with Turner's work

performance. Rather it seems like a "relatively isolated" event

that alone is not actionable. In that respect, Whittaker v. N.

Ill. Univ., 424 F.3d 640, 646 (7th Cir. 2005)(internal quotation

marks omitted)) holds that such "relatively isolated instances of

non-severe misconduct will not support a claim of hostile

21

environment" and thus upheld a summary judgment for the employer even where a supervisory employee called a plaintiff derogatory names, attempted to kiss her and touch her shoulder repeatedly and also left signs saying "I love you" in her work area.  As Baskerville v. Culligan Int'l Co., 50 F.3d 428, 431 (7th Cir. 1995) has explained, "[a] handful of comments spread over months is unlikely to have so great an emotional impact as a concentrated or incessant barrage."

During the actionable time frame Turner was hounded less than the Baskerville plaintiff, for he testified only as to Lake's single isolated comment expressing her sexual desire for him.[5]  Rogers v. City of Chicago, 320 F.3d 748, 752 (7th Cir. 2003)(internal quotation marks and citations omitted) has reiterated the Baskerville articulation of the high threshold for such claims--one that Turner is unable to surmount:

> The occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers would be neither pervasive or offensive enough to be actionable.  The workplace that is actionable is the one that is hellish.

Without more, Turner cannot survive Saloon's motion for summary

---

[5]  Even if the time-barred conduct by Lake were to be added to the mix (an uncertain premise because it would appear to undercut the Morgan-Selan rationale), Turner would fare no better--he would still fall short of the mark in the terms voiced by the Rogers case quoted next in the text.

judgment on his sexual harassment claim.[6]  Hence Saloon's motion

for summary judgment is granted on that claim as well.

## Retaliation Claim

    Hall, 276 F.3d at 357 instructs that "Title VII protects

persons not just from certain forms of job discrimination, but

also from retaliation for complaining about the types of

discrimination it prohibits."  To show through the direct method

of proof that Saloon retaliated against him for reporting sexual

harassment, Turner "must present evidence of:  (1) a statutorily

protected activity; (2) an adverse action; and (3) a causal

connection between the two" (Burks v. Wis. Dep't of Transp., 464

F.2d 744, 758 (7th Cir. 2006)).

Here Turner complained about sexual harassment in 2003 and

2004 and was terminated in December 2004.  Turner seeks to

support the causal connection between the two events by arguing

that (1) his February 2004 performance evaluation stated he was

an outstanding employee, (2) in March 2004 he complained about

the sexual harassment to Bronner and (3) after he complained he

received seven disciplinary warnings, which culminated in his

December termination.

But those facts simply rely on the timing of Turner's

complaint and his termination, without creating even a reasonable

---

[6]  Because Turner cannot demonstrate that he was sexually
harassed, this opinion obviously need not address whether Saloon
would be entitled to the "reasonable care" affirmative defense.

inference as to the requisite causal link. <u>Burks</u>, 464 F.2d at 758 (internal quotation marks omitted) has reiterated that "[s]peculation based on suspicious timing alone...does not support a reasonable inference of retaliation." As <u>Burks</u>, <u>id</u>. at 759 made clear, "the plaintiff must also put forth other evidence that reasonably suggests that [his] protected speech activities were related to [his] employer's discrimination and termination." Like the <u>Burks</u> plaintiff, Turner "presents no evidence of a retaliatory motive other than the timing of [his] termination. Therefore, [ ]he has not met [his] burden under the direct method of proof" (<u>id</u>.).

That relegates Turner to essaying the indirect method of proof, which requires a showing that (<u>Burks</u>, <u>id</u>.):

> (1) [ ]he engaged in protected activity; (2) that [ ]he was subject to an adverse employment action; (3) that [ ]he was performing [his] job satisfactorily; and (4) that no similarly situated employee who did not engage in protected activity suffered an adverse employment action.

If Turner establishes those elements, Saloon has the burden of producing a legitimate, non-discriminatory reason for terminating him (<u>Hall</u>, 276 F.3d at 357-58). If it does so, Turner must show Saloon's reason is merely a pretext for retaliating against him (<u>id</u>. at 758).

Once again Turner cannot establish that he was performing his job satisfactorily. It is undisputed that he got into arguments with busboys, took smoke breaks without permission and

left the restaurant during his shift for personal errands. Most critically, <u>Burks</u>, 464 F.3d at 753 (internal quotation marks and brackets omitted, emphasis in original) instructs that "the critical inquiry is [his] performance at <u>the time of</u> [his] termination." That being so, his February 2004 glowing evaluation is overridden by the undisputed testimony that on the day Braver terminated him he had left Saloon without permission during his shift while customers were still in the restaurant-- surely a permissible employer response to a serious breach of duty (see <u>Burks</u>, <u>id</u>.).[7]

Indeed, even apart from Turner's failure to meet the third element of proof, he has not so much as addressed the fourth one by adducing evidence regarding similarly situated employees. And to cap things off, in all events Saloon has proffered a legitimate, non-discriminatory reason for terminating Turner to which he has failed to provide any response that even suggests Saloon's stated reason for terminating him was pretextual--that it was a sham masking a discriminatory motive. Thus Turner's retaliation claim also fails, and Saloon's motion is granted in that regard as well.

---

[7] As always, this Court does not sit as a super-personnel board, entitled to second guess an employer's honestly-arrived-at decisions as to the appropriate level of discipline for employee misconduct.

<u>Conclusion</u>

Turner has failed abysmally to identify any genuine issue of material fact in response to Saloon's Rule 56 motion as to all his claims other than the Wage Claims. Accordingly, Saloon is entitled to a judgment as a matter of law on all those other claims, which are dismissed.[8] This Court anticipates dealing with the Wage Claims shortly.

_____
Milton I. Shadur
Senior United States District Judge

Date: May 25, 2007

---

[8] As stated at the outset, this opinion moots Turner's Dkt. No. 55 motion.